Earl J. Carroll and Marianne S. Carroll v. Commissioner.
Carroll v. Commissioner
Docket No. 1495-68.
United States Tax Court
T.C. Memo 1971-59; 1971 Tax Ct. Memo LEXIS 279; 30 T.C.M. (CCH) 249; T.C.M. (RIA) 71059; March 29, 1971, Filed *279 The petitioner entered into an agreement with his attorney to credit the amount due to the attorney for legal services in the settlement of petitioner's tax liability against an amount owing by the attorney to the petitioner on account of a cash loan in a prior year. Held: Credit of an amount due for services against a loan due petitioner resulted in a payment on account of legal services, deductible by the petitioner in the year thus credited. The petitioner incurred expenditures in the development of certain patents for which he was to receive an interest in an Italian corporation to be formed in order to exploit the invention. The project was subsequently abandoned as worthless. Held: Upon the abandonment of the project, the expenditures incurred by the petitioner gave rise to a capital loss. The petitioner incurred expenditures and advanced funds for the stock of, or as a capital contribution to, or as a loan to, an Italian corporation formed in order to exploit a certain invention. The funds were dissipated by the promoter, and the petitioner's investment became worthless. Held: Upon the abandonment of the project, the expenditures incurred and investments and loans made *280 by the petitioner gave rise to a capital loss. James R. Zuckerman, for the petitioners. Patrick E. Whelan, for the respondent. QUEALY
Memorandum Findings of Fact and Opinion QUEALY, Judge: The respondent determined deficiencies in the petitioners' income taxes as follows: Year
Amount
1963
$1,581.10
1964
2,814.96
1965
5,012.32
1966
2,931.50 250 The issues presented for decision are: (1) Whether payment was made by the petitioner of certain legal fees; (2) Whether expenditures with respect to certain vibration isolation devices gave rise to ordinary or capital losses; and (3) *282 Whether expenditures with respect to certain cable isolation devices gave rise to ordinary or capital losses. Findings of Fact Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. The petitioners, Earl J. and Marianne S. Carroll, are husband and wife and resided at all times material hereto in Greenwich, Connecticut. The joint tax returns of the petitioners for all periods here involved were filed on the cash basis with the district director of internal revenue, Hartford, connecticut. Inasmuch as Marianne S. Carroll is a petitioner solely as a result of the filing of a joint return, Earl J. Carroll will hereinafter be referred to as the petitioner. Issue 1. Payment of Legal Fees The petitioner, an attorney, conducted a law practice in Germany from 1945 through 1954. In 1961, the respondent determined deficiencies in the petitioner's income taxes for some of those years in the total amount of $920,530.76. The deficiencies were determined with respect to amounts earned by the petitioner in his practice of law in Germany. After extensive proceedings in this and other Federal courts in 1963, *283 it was ordered and decided pursuant to agreement of the parties that there was a deficiency in only one of the years in the amount of $70,000. The petitioner was represented in the court proceedings, as well as in proceedings at the administrative level, by Temple W. Seay (hereinafter "Seay") of Washington, D.C. who was an experienced tax attorney. The petitioner paid Seay a retainer of $2,500 in 1959 and agreed to pay Seay the balance of his legal fees, which were left undetermined at that time, at the conclusion of the proceedings. In July 1961, which was about the time that Seay prepared a petition to this Court for a redetermination of the deficiencies determined with respect to amounts earned by the petitioner in his practice of law in Germany, Seay asked the petitioner for a loan of $100,000. Seay wanted the loan so that he could cause his wholly owned corporation, Metro-WBOF, Inc. (hereinafter "WBOF"), to discharge a corporate obligation at a discount. The petitioner agreed to lend the $100,000 to Seay with the understanding that any legal fees due Seay at the conclusion of the matter could be offset against the amount of the loan. Seay told the petitioner that all of *284 his assets were held by WBOF and that the petitioner's loan to him would be better secured by having WBOF, as well as himself, obligated to repay the loan. With this in mind, the petitioner and Seay, acting individually and as president of WBOF, entered into an agreement on July 7, 1961 that provided for a loan of $100,000 at 5 percent interest. Under the terms of this agreement, $50,000 was to be advanced immediately and the balance on or before September 30, 1961. A $50,000 note calling for installment payments was to be issued for the initial advance and any notes issued were to be secured by a chattel mortgage on WBOF's operating equipment. The agreement also stated that the petitioner could convert all or any portion of the loan into stock of WBOF. However, the agreement failed to state a conversion price. On the day this agreement was entered into, the petitioner authorized his bank to deliver a bank check to Seay in the amount of $50,000. The bank, at Seay's direction, and without the petitioner's knowledge, made its check for $50,000 payable to Seay and WBOF. Sometime later, the petitioner received from Seay promissory notes issued by WBOF for the $50,000 that the petitioner *285 had advanced to Seay. Upon the petitioner's request for Seay's personal notes for this advance, Seay promised to substitute his own note for WBOF's notes when the second $50,000 advance was made and further promised to issue, as security for the repayment of his notes, a chattel mortgage covering 50 percent of his stock interest in WBOF. On October 3, 1961, relying on Seay's promises, the petitioner mailed to Seay separate checks in the amount of $30,000 and $20,000, making a total of $50,000. These checks were made payable to Seay. On the back of the checks, the petitioner typed "Loan per agreement dated July 7, 251 1961." The checks were endorsed by Seay and deposited by him in WBOF's bank account. During the following week, the petitioner met with Seay in Washington, D.C. At that time, the petitioner returned to Seay the notes issued by WBOF for the first advance of $50,000 and requested Seay's personal note for $100,000. However, after Seay explained that his endorsement of WBOF's note would make him personally liable for the loan, the petitioner accepted WBOF's note endorsed by Seay in the amount of $100,000. That note provided for interest at 5 percent and payments of *286 $25,000 on July 1, 1962, March 31, 1963, March 31, 1964 and March 31, 1965. On December 27, 1961, Seay executed a chattel mortgage in favor of the petitioner mortgaging 50 percent of the stock of WBOF to secure payment of the note issued by WBOF and endorsed by him. At the end of 1962, it was apparent that a settlement of the litigation regarding amounts earned by the petitioner while practicing law in Germany would be reached. At the beginning of 1963, the petitioner and Seay agreed that Seay's legal fees for representing the petitioner in that litigation would be $75,000, which would be credited against the $100,000 due the petitioner. However, no memorandum of payment has been signed and no transfer of the notes has taken place. The balance sheet of WBOF as of December 31, 1962, as certified by the auditors of WBOF in 1963, contained a footnote to paid-in surplus that stated, in part, as follows: Under date of July 7, 1961 the Company borrowed from Mr. Earl J. Carroll the sum of $100,000.00; secured by a negotiable promissory note executed by the company and further secured by Mr. Temple W. Seay (sole stockholder and President of Metro WBOF Inc.) personally. At a later date *287 in 1962, Mr. Carroll became indebted to Mr. Seay in rendered. It was agreed between the parties that the sum of $75,000.00 owed by Mr. Carroll to Mr. Seay be offset against the sum of $100,000.00 owed by the company to Mr. Carroll. Under effective date of December 31, 1962, Mr. Seay assigned all rights to this legal fee to the company. Notes payable (due in three equal installments of $25,000.00 each) on the books of the company have therefore been reduced $75,000.00 and a corresponding credit of $75,000.00 has been applied to paid-in surplus together with accrued interest to date. During April 1964, WBOF went into receivership. The petitioner did not file any claim with the receiver. In his 1963, 1964 and 1965 tax returns, the petitioner claimed a deduction of $25,000 as legal fees under the theory that Seay's fee was paid as the installment payments on WBOF's note fell due in those years. In his 1966 return, the petitioner claimed a nonbusiness bad debt deduction of $25,000 with respect to the final installment payment due on the note issued by WBOF. In his notice of deficiency, the respondent disallowed the deductions for legal fees. The respondent did not disallow the bad *288 debt deduction claimed in 1966. Issue 2. Expenditures With Respect to Certain Vibration Isolation Devices As the petitioner's tax case drew to a close, he sought an activity in which he could invest his funds profitably and which would occupy his time. While on vacation in Italy in 1960, the petitioner met Carlo Camossi (hereinafter "Camossi"), a mechanical engineer from Milan. The petitioner met Camossi several times later at an Italian resort. When they met in 1962, the petitioner had a folder with him that described certain vibration isolation devices utilizing cables in tension that were being developed by Kerley Engineering, Inc. of Kensington, Maryland (hereinafter "Engineering"). The petitioner and Camossi discussed these devices and later in 1962 Camossi came to the United States to meet with officials of Engineering. On December 19, 1962 the petitioner, acting as attorney for Camossi, negotiated and executed an agreement with James J. Kerley (hereinafter "Kerley") and Ngineering. Under the terms of this agreement, Camossi was to form Kerley Engineering International, S.R.L. (hereinafter "KEI"), a "Societa Responsibilita Limitata" under Italian law, for the purpose *289 of acquiring and perfecting certain vibration isolation patent rights that were held by Kerley and Engineering. Kerley was to provide technical assistance in developing the devices for a stated fee plus expenses. Referring to KEI, the agreement stated, in part, * * * Said corporation to be granted the sole and exclusive right, privilege and license within Italy and Germany to manufacture all items contained in said 252 [sic] inventions, improvements and patents referred to in this agreement and in that certain indenture of even date executed by the parties hereto. The corporation hereinabove referred to shall be at liberty to gran [sic] sublicenses hereunder to manufacture and sell the said items within the countries of Italy and Germany. On January 21, 1963 it was agreed that KEI would not be established until June 1, 1963 and that during the interim exploratory research and studies would be conducted. Under his agreement with Engineering and Kerley, Camossi was required to finance the venture. In January 1963, the petitioner and Camossi agreed that in consideration of matching Camossi's expenditures the petitioner would receive one half of Camossi's interest in the *290 agreement with Engineering and Kerley. Pursuant to his agreement with Camossi, the petitioner paid $8,000 to Engineering for research work on the devices and $5,000 to Camossi for research and development work on the devices. In 1963, the petitioner obtained a $5,000 promissory note from Camossi, payable April 1, 1966, together with an option to purchase a one-third interest in KEI at a price of $5,000 payable by cancellation of the note. The note and option were issued by Camossi as security that he had properly used the $5,000 advanced by the petitioner and that he would transfer to the petitioner, when and if desired, a onethird interest in KEI. During 1962 and 1963, the petitioner paid $2,569.49 for travel and other expenses incurred by him in connection with the venture. By March 1963, Camossi had concluded that changes and improvements in the patents were required in order to achieve commercial application. However, prior to making these changes and improvements, Camossi wished to obtain from Engineering certain patent documentation that Engineering appeared reluctant to send to him. Camossi believed that Engineering's reluctance to send the documentation stemmed from *291 the fact that KEI had not been organized. Accordingly, in March 1963, KEI was formed in Italy by Camossi and another Italian engineer. The authorized capital of KEI was 900,000 lire of which 600,000 lire was subscribed by Camossi and 300,000 lire by the other engineer. As required by Italian law, three tenths of the capital, 270,000 lire (about $450), was paid in to KEI. About the time KEI was formed, the petitioner and Camossi learned that Engineering had allowed the German patent rights covering the vibration isolation devices to lapse. They also learned that other foreign patent rights were not owned by Engineering. In April 1963, Camossi and the petitioner abandoned their efforts to develop and improve the patents held by Kerley and Engineering. The petitioner never exercised his option to acquire a one-third interest in KEI, as he decided to abandon the venture. KEI never became a functioning entity, and no stock or other interests were ever issued. At the time that the petitioner made the above described expenditures, which totaled $15,569.49, he intended to acquire an interest in KEI or to be reimbursed in kind or in some other manner if KEI became profitable. The petitioner *292 was not engaged in the trade or business of developing and promoting inventions during 1962 through 1964. On his tax return for 1964, the petitioner claimed that advances for product development in the total amount of $15,569.49 resulted in a loss in that amount in 1964 in connection with his trade or business of "Promotion of Inventions." In his notice of deficiency, the respondent determined that the petitioner was to be reimbursed by KEI for the $2,569.49 of expenses incurred by the petitioner and the $8,000 payment to Engineering and thus that these amounts were loans to KEI that gave rise to nonbusiness bad debts in 1964 when they became worthless. The respondent determined that the $5,000 advanced to Camossi evidenced by Camossi's not payable April 1, 1966 and the option to acquire a one-third interest in KEI gave rise to a nonbusiness bad debt in 1966. Issue 3. Expenditures with Respect to Cable Isolation Devices At about the time that their venture to develop and exploit the inventions of Engineering and Kerley was abandoned, the petitioner and Camossi embarked upon a new venture. This new endeavor involved the development of certain cable isolation devices that had *293 been invented by Camossi and others. 253 On April 1, 1963 the petitioner and Camossi agreed to finance equally the cost of perfecting those inventions. They were to have an equal interest in any patents obtained and were to sell the inventions either to third parties or to Cable Isolation Systems, S.p.A. (hereinafter "CIS"), an Italian corporation, in which they were to have equal interests. Camossi was to hold any funds advanced by the petitioner in trust and as security for his performance was to execute a promissory note in the amount of the advance that would become null and void upon his performance of his obligations as trustee. Sometime in April 1963, the petitioner paid $35,000 to Camossi, and Camossi executed a promissory note in that amount, together with an option to acquire an undivided one-half interest in CIS for $35,000 payable by cancellation of the note. The note and option were a security device to assure that Camossi would carry out the terms of the agreement. On May 8, 1963, CIS was formed and one-half of its authorized stock with a stated value of $2,700 was issued to the petitioner. [1] In September 1963, the petitioner advanced $20,000 to CIS and received *294 CIS's promissory note with 5 percent interest due September 16, 1966. After Camossi had assigned certain patent applications to CIS and it was determined that CIS was ready to begin production of the cable isolation devices, the petitioner and Camossi agreed in November 1963 to increase CIS's capitalization, to contribute $25,000 each to CIS to pay for machinery, and to guarantee a $200,000 line of credit for CIS by depositing an equal amount of collateral security with the First National City Bank. Camossi advised the petitioner by letter and telephone that he had ordered the machinery and had deposited satisfactory security with the Milan branch of the First National City Bank. The petitioner then on December 13, 1963 forwarded $25,000 to that branch with the instructions that it be deposited in CIS's account. At this point, the petitioner had also expended $4,851.77 in connection with CIS's development of the cable isolation devices. By a letter dated January 30, 1964, the petitioner was advised by an *295 Italian bank with which CIS had an account that they had received $21,724 as payment for 13,500 additional shares of CIS stock issued to the petitioner. The petitioner then learned that Camossi had not deposited with the First National City Bank either his $25,000 or satisfactory collateral for the line of credit. The petitioner also learned that Camossi had withdrawn the $25,000 the petitioner had deposited in the Milan branch of the First National City Bank and had deposited that sum in CIS's account in the Italian bank that had notified the petitioner of his increased stock interest in CIS. In February 1964 the petitioner and Camossi met in Milan. Camossi told the petitioner that he had made a direct $25,000 payment on behalf of CIS when he ordered the machinery and that he was arranging a line of credit with a bank in Rome as his properties were not accepted as collateral by the First National City Bank. The petitioner and Camossi then executed an agreement to supplement their agreement of April 1, 1963. This agreement of February 19, 1964, recited that the petitioner had advanced $80,000 pursuant to earlier agreements and stated that the advances were to be allocated as *296 follows: (1) $25,000 to purchase 50 percent of the stock of CIS; (2) $30,000 to finance CIS's research development and exploitation of cable isolation devices; and (3) $25,000 to finance inventions embraced in patent applications held by Camossi in trust as the joint property of the petitioner and Camossi. In March 1964, the petitioner again went to Milan. He determined that Camossi had leased a plant but had installed only one machine in that factory. The petitioner retained an Italian attorney and made an unsuccessful attempt to obtain an accounting from Camossi as to the disposition of the $80,000. Due to the expense involved and on the advice of his attorney, the petitioner decided not to bring any legal action against Camossi. The petitioner expended $4,000.74 in his efforts in 1964 to protect or recover his $80,000. In that year, the petitioner abandoned his efforts with respect to CIS's cable isolation devices and the patent applications held by Camossi. The stock and note issued by CIS to the petitioner became worthless in 1964. 254 On his 1964 tax return, the petitioner deducted the $80,000 as a loss arising from the embezzlement by Camossi of funds entrusted *297 to him for the development and operation of CIS. In his notice of deficiency, the respondent allocated to the petitioner's CIS stock the $35,000 and $25,000 payments made pursuant to the April and November agreements and determined that the stock became worthless in 1965 giving rise to a loss on account of worthless securities in the amount of $60,000. The respondent determined that the $20,000 advanced to CIS evidenced by CIS's note payable September 16, 1966 gave rise to a nonbusiness bad debt in 1965. On his 1964 tax return, the petitioner deducted the $4,851.77 that he expended in connection with CIS's development of the cable isolation devices and the $4,000.74 that he expended to protect or recover his $80,000 as business expenses. In his notice of deficiency, the respondent determined that the $4,851.77 represented a loan to CIS which became worthless in 1965 giving rise to a nonbusiness bad debt but allowed the deduction of the $4,000.74 as an expense incurred to protect or recover an investment. The following tables summarize the deductions claimed by the petitioner on his returns and the action taken by the respondent on his notice of deficiency: ITEMS
DEDUCTIONS AS CLAIMED ON RETURNS
1963
1964
1965
1966
1. Legal fees
$25,000.00
$25,000.00
$25,000.00
2. Expenses incurred in connection with the trade or business of promotion of inventions.
a. Payment to Engineering
8,000.00
b. Payment to Camossi
5,000.00
c. Expenditures in connection with the development of the vibration isolation devices
2,569.49
d. Expenditures in connection with the development of the cable isola- tion devices
4,851.77
e. Expenditures in attempt to protect or recover investment in CIS
4,000.74
3. Loss arising from embezzlement
80,000.00
ITEMS
DEDUCTIONS AFTER ADJUSTMENTS
1963
1964
1965
1966
1. Legal fees
2. Nonbusiness bad debts
a. Payment to Engineering
$ 8,000.00
b. Payment to Camossi
$ 5,000.00
c. Expenditures in connection with the development of the vibration isolation devices
2,569.49
d. Expenditures in connection with the development of the cable iso- lation devices
$ 4,851.77
e. Loan to CIS
20,000.00
3. Worthless securities
a. Advance for CIS stock
35,000.00
b. Advance for CIS stock
25,000.00
4. Expenses incurred to protect or re- cover investment in CIS
4,000.74
*298 Opinion Issue 1. Payment of Legal Fees The respondent does not question that the requirements of section 162 [2] for the deduction of the $75,000 of legal fees have been met except as to the element of payment. The respondent contends that no payment of the legal fees was ever made, as no final agreement was ever reached by the 255 petitioner and Seay regarding the fees due Seay and the loan due the petitioner. The respondent's objection has been overcome by a clear showing that the petitioner and Seay agreed in 1963 to offset the $75,000 of legal fees due Seay against the $100,000 loan due the petitioner.[3]Although mutual debts do not per se extinguish each other, the actual offset by agreement of the parties of one debt against another operates as payment. See Bailey v. Commissioner, 103 F. 2d 448 (C.A. 5, 1939), affirming a Memorandum Opinion of this Court. The $75,000 of legal fees were paid when the petitioner and Seay agreed in 1963 to offset the legal fees against the loan. *299 Bailey v. Commissioner, supra.The deduction must be taken in full in 1963, the year of payment. Section 1.461-1, Income Tax Regs.
Issue 2. Expenditures With Respect to Certain Vibration Isolation Devices Towards the end of 1962, the petitioner was principally occupied in seeking various profitable investments which would occupy his time. During that year, he met Camossi, a prior acquaintance, in Italy. Camossi, an Italian mechanical engineer, expressed an interest in information the petitioner had with him relating to certain vibration isolation devices being developed by Engineering. Discussions regarding those inventions between the petitioner, Camossi, and Kerley led to an agreement in December 1962 between Camossi, Engineering, and Kerley. The agreement, which the *300 petitioner had negotiated on behalf of Camossi, provided that Camossi would form KEI, a corporation in which he would have a two-thirds interest and Engineering would have a one-third interest. Camossi through the formation of KEI was to undertake the commercial exploitation of the inventions described in the agreement, and KEI was to have the exclusive right to manufacture and sell items developed from those inventions in Italy and Germany. Camossi was to provide all the financing required for this venture. Subsequently, the petitioner and Camossi agreed that the petitioner would have a one-third interest in KEI and that he and Camossi would jointly finance the venture. During 1962 and 1963, the petitioner expended $2,569.49 on behalf of this venture, paid $8,000 to Engineering for research work on the inventions, and paid $5,000 to Camossi for research and development work on the inventions. The respondent contends that the $2,569.49 expense and the $8,000 payment to Engineering were loans that gave rise to nonbusiness bad debts in 1964 and that the $5,000 payment to Camossi gave rise to a nonbusiness bad debt in 1966. The petitioner contends that those expenditures, which *301 totaled $15,569.49, were properly deductible in 1963 as either losses or expenses incurred in the trade or business of promoting inventions or as losses incurred in a transaction entered into for profit. In our view, the petitioner acquired in January 1963 the right to receive a one-third interest in KEI in consideration of matching any investment made by Camossi in the venture. KEI was referred to in the agreement between Camossi, Engineering, and Kerley as a "corporation," a characterization that we will rely on in the absence of more specific details as to the nature of this entity. Section 7701(a)(3). Under his agreement with Camossi, the petitioner acquired the right to receive a one-third interest in the corporation in consideration of expenditures which totaled $15,569.49. We must assume that the one-third interest was an ownership interest, that is stock (section 7701(a)(7); Warren v. King, 108 U.S. 389 (1883); Hamlin v. Toledo, St. L. & K.C.R. Co., 78 F. 664 (C.A. 6, 1897)); and thus conclude that the petitioner acquired a right to receive a "security" within the meaning of section 165(g).[4] See sections 1.165-4(d); 1.165-5(a)(2), Income Tax *302 Regs. Accordingly, the $15,569.49 expenditure gave rise to a loss in 1963 under 256 section 165(g) when the right to receive that interest became worthless in that year. Camossi did issue a note for the $5,000 advance, however, the note was issued only to assure that Camossi had used the funds in the venture and would transfer a one-third interest in KEI to *303 the petitioner. It is clear from these facts that the note was only an additional evidence of the petitioner's investment in KEI rather than a debt. Larry E. Webb, 23 T.C. 1035 (1955). Issue 3. Expenditures With Respect to Cable Isolation Devices The petitioner expended $35,000, $20,000, $25,000 and $4,851.77 in connection with the development of the cable isolation devices. Although his return indicated that the $35,000, $20,000 and $25,000 expenditures resulted in embezzlement losses, the petitioner now argues that only the $25,000 expenditure resulted in an embezzlement loss. In the interest of clarity, each expenditure is considered separately below. $35,000 Expenditure The petitioner and Camossi organized CIS, an Italian corporation, through which they attempted to develop and exploit the cable isolation devices. The petitioner advanced $35,000 to Camossi in April 1963 with the understanding that he would receive one-half of the stock of CIS for that advance. In May 1963, approximately 30 days after the advance, CIS was formed, and the petitioner received one-half of its stock. CIS was a viable and operating entity from May 1963 until sometime in 1964. *304 There is no doubt that $2,700 was paid into CIS for the petitioner's stock. The petitioner does not deny that at least $7,300 of the $35,000 was also advanced to CIS. It is clear that this advance was a capital contribution. Thus, at this point, it can be concluded that $10,000 of the $35,000 advance gave rise to a loss under section 165(g). With respect to the remaining $25,000, the petitioner contends that his agreement with Camossi of February 19, 1964 allocated that amount to a joint venture of the petitioner and Camossi to develop inventions. Notwithstanding this attempt in the year following the advance to carve out $25,000 as not being for CIS stock, petitioner has not demonstrated that less than the entire $35,000 was advanced through Camossi to CIS. Accordingly, the full $35,000 must be treated as having been advanced for a one-half interest in CIS and that advance gave rise to a loss under section 165(g) when the CIS stock became worthless in 1964. $20,000 Expenditure The petitioner advanced $20,000 to CIS and received CIS's note payable to his order. The petitioner concedes on brief that this transaction was a loan to CIS. Accordingly, this loan of $20,000 gave *305 rise to a loss under section 166(d)[5] when it became worthless in 1964. $25,000 Expenditure The petitioner deposited $25,000 in CIS's account with the Milan branch of the First National City Bank. The petitioner admits on brief that Camossi withdrew those funds under his authority as managing director of CIS. The facts indicate that at *306 least $21,724 of this advance to CIS was deposited in CIS's account in an Italian bank in payment of shares of CIS stock. The petitioner contends that Camossi defrauded him and that he suffered a theft loss within the meaning of section 165 (c)(3). This contention is not supported by the facts. There is no evidence that those funds were used for other than corporate purposes. There is also no basis for the petitioner's contention with respect to fraud by use of the mails or telephone and radio in foreign commerce. Accordingly, this capital contribution of $25,000 gave rise to a loss under section 165(g) when the CIS stock became worthless in 1964. 257 $4,851.77 Expenditure The petitioner expended $4,851.77 in connection with CIS's development of the cable isolation devices. Amounts paid by a stockholder for expenses that are properly allocable to the business of the corporation are not deductible as business expenses by the stockholder. James M. Hawkins, 20 T.C. 1069 (1953). Thus, the petitioner improperly deducted the $4,851.77 as a business expense. This expenditure *307 represented an advance to CIS which gave rise to a loss under section 165(g) when the CIS stock became worthless in 1964. Decision will be entered under Rule 50. Footnotes
1. Both the petitioner and his wife were listed as owners of this CIS stock. However, for our purposes, we can consider the petitioner alone as the owner of this stock.↩
2. All section references are to the Internal Revenue Code of 1954, as amended.↩
3. Although the facts are somewhat contradictory, they establish that Seay became indebted to the petitioner on the petitioner's advance of $100,000 to Seay, which Seay, in turn, advanced to WBOF. The respondent on brief recognizes that the petitioner's loan was to Seay.↩
4. SEC. 165(g). Worthless Securities. - (1) General rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; (B) a right to subscribe for, or to receive, a share of stock in a corporation; or (C) a bond, debenture, note, or certificate, or other evidence of indebtedness, issued by a corporation or by a government or political subdivision thereof, with interest coupons or in registered form.↩
5. SEC. 166(d). Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩